FILED
2021 Dec-10  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **DAPHNE BERRY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: 5:19-cv-01407-LCB** |
| ) | |
| **CRESTWOOD HEALTHCARE,** ) | |
| **L.P., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination case is before the Court on Defendants' Motion for Summary Judgment. (Doc. 23). Plaintiff Daphne Berry claims she suffered racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 while employed by Crestwood Healthcare. (Doc. 1). She also claims Defendants are liable for negligence and outrage under Alabama law. Defendants' Motion has been fully briefed and is ripe for review. For the following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment.

### I. Summary of the Facts

Defendant Crestwood Healthcare ("Crestwood") is a community healthcare provider in the Huntsville, Alabama area with an inpatient hospital. (Doc. 27-1 at ¶ 3). Crestwood is a subsidiary of Community Health Systems, Inc. ("CHS"), and

an affiliate of Defendant CHS Professional Services Corporation ("CHSPSC"). *Id.* CHSPSC provides management and consulting services to Crestwood. (Doc. 31-4 at 4).

Berry, who is black, started working for Crestwood as a nurse in 2007. (Doc. 27-12 at 6). At some point, Crestwood promoted her to Charge Nurse for the emergency department ("ED"). *Id.* at 19-20. As Charge Nurse, Berry supervised the other nurses in the ED. *Id.* at 20, 35.

Several of Berry's problematic co-workers bear on this case. First, in February 2018, Berry had an argument with Shane Gann, a white nurse, during which Berry told Gann he was not a good nurse. (Doc. 31-1 at ¶ 22). Gann screamed at Berry in front of her supervisor, Nurse Manager Debra Pressnell. *Id.* Gann slammed his hand on Pressnell's whiteboard and screamed, "I'm a man goddamnit." *Id.* Berry received an informal counseling about the incident. (Doc. 27-12 at 24-25). Gann then threatened another co-worker and resigned before Crestwood could discipline him. *Id.* at 67; (Doc. 27-19 at 18).

Next, Crestwood placed Paul Mizzelle, a white nurse, on a Performance Improvement Plan because ED Director Jennifer Brown received feedback that he exhibited bullying behaviors. (Doc. 27-23 at ¶ 3). Mizzelle received complaints from co-workers while he was on his Performance Improvement Plan for which he was not disciplined. (*See* Doc. 27-19 at 28); (Doc. 31-1 at ¶ 34); (Doc. 31-2 at ¶ 22).

Next, multiple employees accused Bob Camp, a white nurse, of sexual harassment for years. (Doc. 27-19 at 14-15); (Doc. 31-1 at ¶ 25). Camp resigned after Brown discussed the accusations with him. (Doc. 27-19 at 14-15).

Most of Defendants' actions against Berry arise from an incident in the ED on February 22, 2018. That day, Berry and several other nurses treated an altered and combative psychiatric patient. (Doc. 27-12 at 31-33). Nurses were recorded on video singing, dancing, and laughing in the room with the patient. *Id.*; (Doc. 27-19 at 22-23). One nurse slapped the patient's hand. (Doc. 27-12 at 33). Brown and Crestwood Human Resources Director Rita Wallace held a meeting with the nurses involved in the incident and admonished them for their unprofessional behavior. *Id.* at 42-43. Each nurse, all of whom except for Berry were white, received a three-day unpaid suspension and Berry was demoted from Charge Nurse. *Id.* at 74; (Doc. 27-19 at 23-26); (Doc. 27-30 at ¶ 6); (Doc. 31-1 at ¶ 31).

Chrissy Hood, who was one of the nurses involved in the incident, had her suspension reduced to one day because Susan Bryce, the Chief Nursing Officer, believed that the video footage of the incident showed that Hood "was not involved in patient care and instead was standing in the room laughing at times." (Doc. 27-30 at ¶ 6). Bryce wanted to talk to Berry about revoking her suspension as well, but Berry declined the opportunity. (Doc. 27-12 at 48). Hood was not demoted from her position as Relief Charge Nurse. (Doc. 27-19 at 26); (Doc. 31-1 at ¶ 32). In her

declaration, Pamela Walls, a unit secretary in the ED, recalled that several of the suspended nurses, unlike Berry, were allowed to return before their suspensions ran and the suspensions were not recorded in their employment records. (Doc. 31-2 at ¶ 18).

Another unit secretary, Sheila Primeau, filed a complaint about the February 22 incident. (Doc. 31-1 at ¶ 27); (Doc. 31-2 at ¶ 14). Berry informed her supervisors that Primeau, who is white, made the complaint in an effort to have Berry and the other black nurses on staff terminated. (Doc. 27-12 at 11); (Doc. 31-1 at ¶ 27). Berry and Walls testified that Primeau was racist and said that she wanted "them"— referring to the black nurses—out because they were loud. (Doc. 27-12 at 11, 37, 44, 52); (Doc. 31-2 at ¶ 14).

On March 14, 2018, Berry made an anonymous call to the CHS corporate compliance hotline to report the February 22 incident and allege that management mistreated the ED nurses and made them feel targeted and afraid of retaliation. (Doc. 27-12 at 7-8); (Doc. 31-3 at 8-9). She anonymously called the compliance hotline again on April 9, 2018, and alleged that Primeau made racist remarks and filed a false complaint regarding the February 22 incident to have the black nurses fired. (Doc. 27-12 at 8, 12); (Doc. 31-3 at 21-22). She followed up with several calls through May 2018 and identified herself as the caller on April 12, 2018. (Doc. 31-3 at 21-22, 33-34, 54, 66). And she submitted a written complaint to CHS with similar

allegations against Crestwood management and Primeau. (Doc. 27-12 at 49); (Doc. 27-15 at 25-29).

Lisa Friday, the Regional Human Resources Director for CHSPSC, investigated Berry's and others' complaints about the Crestwood ED. (Doc. 27-29 at ¶ 3). She also sought to discover the reasons for significant staff turnover in the ED. *Id.* She interviewed 24 staff members in the ED. *Id.* at ¶ 4. According to Friday, "[a] common thread of the interviews was [Berry's] negativity, bullying, unprofessional behavior, and that she was the common denominator of the workplace interpersonal conflicts." *Id.* at ¶ 7. So Friday "concluded that removing [Berry] from the Crestwood ED's work environment would improve morale and reduce turnover" and recommended terminating Berry's employment. *Id.* at ¶¶ 9-10.

Pressnell and Walls alleged that Friday conducted biased interviews. Pressnell testified that she told Friday that a clique of nurses was targeting Berry and that Gann was the source of the negativity in the ED. (Doc. 31-1 at ¶ 36). According to Pressnell, Friday cut her interview short "[w]hen she realized [Pressnell] did not have negative words about [Berry]." *Id.* Similarly, Walls testified that Friday prevented her from talking positive about Berry and disregarded her statements about Primeau targeting black nurses. (Doc. 31-2 at ¶ 22). Walls accused Friday and the investigation of being racist. *Id.*

Brown, Bryce, and Wallace discussed and accepted Friday's recommendation to terminate Berry. (Doc. 27-23 at ¶ 8). On May 18, 2018, Brown, Bryce, and Wallace met with Berry and informed her that Crestwood was terminating her employment. (Doc. 27-12 at 64-65); (Doc. 27-23 at ¶ 8); (Doc. 27-30 at ¶ 5). Wallace arranged for security to be present nearby because of information about Berry's temperament gleaned from Friday's interviews and reports that Berry carried a gun and had previously slashed coworkers' tires when she was terminated from a prior job. (Doc. 27-31 at ¶ 5). A security guard escorted Berry out of the building. *Id.* at ¶ 6. Six to eight security guard lined the walkway as she was leaving the hospital and two police officers made sure she left the parking lot. (Doc. 27-12 at 65-66). Crestwood claimed to involve security and police with employee terminations when there were concerns about the employee's reaction. (Doc. 27-2 at 29); (Doc. 31 at 11). However, Berry and Pressnell never saw Crestwood involve security with any ED employee except for Berry. (Doc. 27-12 at 67); (Doc. 31-1 at ¶ 42).

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary

judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and—by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file—designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c), a plaintiff may not simply rest

on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is

clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III. Discussion

The parties first dispute whether CHSPSC is a proper defendant in this case because CHSPSC was not Berry's employer but still played a role in her termination. (Doc. 24 at 21-25); (Doc. 30 at 21-23). The Court need not address this issue because, as explained below, Berry's claims fail on the merits.

### A. Title VII Race Discrimination

Berry first claims Defendants discriminated against her because of her race in violation of Title VII when Crestwood suspended her, demoted her, terminated her, and used security and police when terminating her. (Doc. 1 at ¶¶ 72-77).

In any Title VII claim, the plaintiff "bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (internal quotation marks omitted). A plaintiff may satisfy this burden "through either direct evidence or circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004). The present record contains no direct evidence of racial animus by Defendants. Thus, Berry proceeds with circumstantial evidence.

A plaintiff may use circumstantial evidence to prove intentional discrimination in several ways. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213,

1217 (11th Cir. 2019) (en banc). As one option, the plaintiff may employ the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* As another option, the plaintiff may "present[] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation marks omitted). In addition, the plaintiff may present circumstantial evidence in any form, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff." *Id.*

### 1. McDonnell Douglas

The *Crawford* court explained the *McDonnell Douglas* burden-shifting framework:

> Under [the *McDonnell Douglas*] framework, if the plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination. The inquiry into pretext requires the court to determine, in view of all the evidence, "whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."

*Crawford*, 529 F.3d at 975-76 (citations omitted) (alteration supplied).

The plaintiff's *prima facie* case consists of four elements: (1) that she is a member of a protected class; (2) that she was qualified for her position; (3) that she

suffered an adverse employment action; and (4) that she was treated less favorably than an individual outside of her protected class who was similarly situated to her in all material respects. *Lewis*, 918 F.3d at 1218, 1220-21.

Here, even if Berry could satisfy a *prima facie* case for any of the alleged adverse employment actions—suspension, demotion, termination, and the security presence during her termination—her Title VII discrimination claim fails because, for the following reasons, no evidence shows a genuine dispute as to whether Defendants' legitimate nondiscriminatory reasons for their actions are pretext for discrimination.

Defendants claimed that Crestwood suspended Berry for three days because of her involvement in the February 22, 2018 patient incident; demoted Berry from her position as Charge Nurse because of her responsibility for the nurses involved in that incident; terminated Berry because Friday's investigation revealed Berry as negative, a bully, unprofessional, and the source of interpersonal conflicts; and utilized security and police in terminating Berry out of concern that she would cause a commotion. (*See* Doc. 24 at 26-33).

To show that those legitimate nondiscriminatory reasons are pretext for discrimination, Berry must "meet [each] reason head on and rebut it"; she "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Berry may establish pretext by

revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons for [Defendants'] action[s] that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotation marks omitted). But evidence that a proffered reason was baseless is insufficient by itself. "A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis and quotation omitted). That is, Berry's burden "is to show not just that [Defendants'] proffered reasons for [their actions] were ill-founded but that unlawful discrimination was the true reason." *Alvarez*, 610 F.3d at 1267.

First, Berry asserts that all of Defendants' legitimate nondiscriminatory reasons for their actions are pretext because Defendants allegedly treated her less favorably than four similarly situated white employees. (*See* Doc. 30 at 29, 32-37). Those alleged comparators are Hood, the nurse involved in the February 22, 2018 incident who served a shorter suspension than Berry and, unlike Berry, retained her Charge Nurse position after the incident; Gann, the nurse who screamed at Berry and slammed a whiteboard in the presence of their supervisor, whom, unlike Berry, Crestwood did not counsel and could resign in lieu of termination; Mizzelle, the nurse who, allegedly unlike Berry, was given the benefit of a Performance

Improvement Plan and was not disciplined for complaints; and Camp, the nurse who was not terminated for sexual harassment complaints and instead resigned.

But none of those comparators show that Defendants' proffered legitimate reasons were not what actually motivated their actions against Berry. Those four comparators' misconduct is incomparable to the several consistent complaints of Berry's bullying. Gann and Camp resigned so no reasonable jury could question why Crestwood did not terminate them. Crestwood actually treated Hood and Berry equally because it suspended both employees for their role in the February 22, 2018 incident. No evidence discredits Bryce's opinion that Hood played a lesser role in the incident and therefore deserved a shorter suspension, and even if it did—accepting as true, for example, Berry's counsel's argument that Hood made a vulgar hand gesture and kicked the patient's clothing, (*see* doc. 27-19 at 24), and assuming that that behavior contradicts Bryce's opinion—no evidence shows that discrimination was the real reason for not reducing Berry's suspension because Bryce wanted to give Berry the same opportunity to have her suspension reduced but Berry declined the opportunity. (Doc. 27-12 at 48). And Crestwood demoted only Berry from Charge Nurse because she was the Charge Nurse on duty during the incident and there is nothing questionable about Crestwood holding Berry to a higher standard because of her supervisory responsibilities.

Walls's testimony that "several of the white staff" were allowed to return before their suspensions ran and did not have their suspensions reported in their employment records, (doc. 31-2 at ¶ 18), does not create a genuine dispute of pretext. Walls did not identify who besides Hood returned early or why they did so. She did not provide any basis for her recollection or explain why she had personal knowledge of nurses' employment records. In other words, her testimony on this point is vague and would leave a jury to speculate as to whether any nurse besides Hood had her suspension reduced. Moreover, witnesses for both Berry and Defendants who provided a reliable basis for their testimony—Berry, Pressnell, Brown, and Bryce— established that Hood was the only nurse to have her suspension reduced. (*See* Doc. 27-12 at 48); (Doc. 27-17 at 24); (Doc. 27-30 at ¶ 6); (Doc. 31-1 at ¶¶ 31-32).

In addition to the lack of differential treatment between similarly situated employees, no other evidence supports a reasonable inference that Crestwood's reason for terminating Berry is pretext. In deciding to terminate Berry, Brown, Bryce, and Wallace relied on Friday's interviews with 24 ED staff members, and "[a] common thread of the interviews was [Berry's] negativity, bullying, unprofessional behavior, and that she was the common denominator of the workplace interpersonal conflicts." (Doc. 27-29 at ¶ 7). Specifically, several interviewees reported that "[Berry] is always in the mix of everything that causes problems"; "when [Berry] is around, there is chaos and continual bickering";

"[t]here is much bullying by [Berry]. She is mean and doesn't allow RNs to do their jobs. She won't help anyone and, in fact, yells and screams at them and won't help them"; "[Berry] would never assist and is a bully and demeans people"; Berry instigated "terrible nurse bullying . . . which includes unprofessionalism, cursing, [and] yelling"; "people are afraid to ask questions for fear of the wrath from [Berry]"; "bullying and intimidation" is "mostly done by [Berry]"; Berry was the "ring-leader" of a "mean girls" clique of bullies that caused at least seven employees to quit; "[Berry] screams and fights with people"; Berry demeaned gay people and continually cursed; Berry was "horribly mean [and] rude"; Berry "compromises patient care when people ask her for help"; Berry "lies and is manipulative"; "[Berry] is a major problem. She is rude, yelling, stirring up trouble"; and "there is a sense of paranoia when [Berry] is working." (Doc. 27-27 at 11-16). Faced with these consistent reports of Berry's behavior from several witnesses, Crestwood reasonably decided to terminate her employment.

No evidence supports a reasonable inference that Friday was racially biased in investigating the ED or prevented or ignored positive remarks about Berry during the interviews. The only evidence of racial animus on the record is from Primeau, who said she wanted the black nurses fired for being loud. But Primeau's remark is not evidence of pretext. She was a unit secretary with no authority over Berry, she was not a decisionmaker, she was only one interviewee of many who described

Berry's bullying, and Crestwood's decision to terminate Berry would be reasonable and nondiscriminatory with or without Primeau's remark. And even if Friday prevented Pressnell and Walls from speaking positively about Berry or disregarded their remarks, their full stories about Berry would not have contradicted Crestwood's decision in light of the overwhelming evidence of Berry's bullying.

Berry further argues that Defendants' reasons for terminating her are pretext for race discrimination because Defendants and Friday knew before Friday's investigation that Berry had told CHS several times that the response to the February 22, 2018 incident was racially motivated. (Doc. 30 at 36-37). Her argument seems to be that a reasonable jury could find it suspicious that she complained about racial discrimination, Friday then conducted her investigation, Friday received allegations from Berry, Pressnell, and Walls of racism, and yet Crestwood terminated Berry. The argument fails because no evidence supports a reasonable inference that Friday was racially biased or used her investigation to target Berry. In fact, Friday began her investigation in part to investigate Berry's allegations. If Friday's investigation did not uncover a legitimate, non-racial basis to terminate Berry, then a reasonable jury might infer that Friday, and by extension Berry's termination, was racially motivated all along. But Friday's investigation did uncover a legitimate, non-racial basis to terminate Berry.

Next, Berry asserts that her positive employment record casts doubt on Defendants' legitimate nondiscriminatory reasons. (*See* Doc. 30 at 37). The Court disagrees because Berry's positive contributions to the ED do not dispute the justifiable reasons for suspending, demoting, and terminating her nonetheless.

Finally, Crestwood's explanation for utilizing security and police when it terminated Berry—in case she caused a commotion—is not pretext. Wallace arranged for the security escort because of reports that Berry was temperamental, carried a gun, and had previously slashed coworkers' tires when she was terminated from a prior job. (Doc. 27-31 at ¶ 5). Whether or not those reports were true, there is no evidence that the reports were a product of racial animus or that Wallace should have doubted the reports. Therefore, no reasonable jury could find that discrimination was the real reason for the security presence.

In sum, no evidence disputes that Defendants' nondiscriminatory reasons were the real reasons for their actions against Berry, and Berry has therefore failed to defeat summary judgment with the *McDonnell Douglas* framework.

### 2. The "Convincing Mosaic" Standard

As an alternative to *McDonnell Douglas*, a Title VII plaintiff can defeat summary judgment with "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis*, 934 F.3d at 1185 (internal quotation marks omitted). "A 'convincing mosaic' may be shown by evidence that

demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (internal quotation marks omitted).

Berry assembles her purportedly convincing mosaic of circumstantial evidence of discrimination with the same evidence she used in attempting to allege a *prima facie* case and cast Defendants' actions as discriminatory under *McDonnell Douglas*. (*See* Doc. 30 at 38-40). The Court has already discussed all such evidence and found that none of it supports a reasonable inference of discrimination. So her Title VII discrimination claims also fails to satisfy the "convincing mosaic" standard of proof.

### 3. Any Additional Circumstantial Evidence of Discrimination

A Title VII plaintiff also may defeat summary judgment without relying on any rigid framework. *See Smith*, 644 F.3d at 1328. The plaintiff will survive summary judgment if *any* circumstantial evidence raises a reasonable inference of discrimination. *Id.* But no such evidence exists in this case. The Court has already discussed all of the pertinent record evidence, none of which supports a reasonable inference of discrimination.

Because there is no genuine dispute as to whether Defendants discriminated against Berry because of her race, the Court will grant summary judgment for Defendants on the Title VII discrimination claim.

## B. Title VII Retaliation Claim

Berry alleges that Defendants retaliated against her for complaining several times about the February 22, 2018 incident by terminating her and subjecting her to security and police in violation of Title VII. (Doc. 1 at ¶¶ 78-82).

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Courts in the Eleventh Circuit utilize the *McDonnell Douglas* burden-shifting framework to analyze Title VII retaliation claims based on circumstantial evidence. *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020).

Berry does not offer any new arguments or evidence for why Defendants' legitimate reasons for terminating her and using security and police are pretext for retaliation. In other words, she contends that Defendants' explanations are pretext for retaliation for the same reasons they are pretext for discrimination. The Court has already determined that the record lacks evidence of pretext. No reasonable jury could doubt whether Defendants' legitimate nondiscriminatory and nonretaliatory

reasons for their actions were the real reasons for their actions. So, for the same reasons that Berry's discrimination claim fails for lack of pretext, so too does her retaliation claim.[1]

## C. Section 1981 Discrimination Claim

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). "Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under section[] 1981 . . . , the legal elements of the claims are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985). Therefore, because Berry's discrimination claim fails under Title VII, the claim based on the same facts also fails under Section 1981.

## D. Section 1981 Retaliation Claim

Section 1981 provides a cause of action for retaliation. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008). Section 1981 retaliation claims "have the

---

[1] The Eleventh Circuit has not in binding precedent decided whether a convincing mosaic of circumstantial evidence of retaliation can defeat summary judgment on a Title VII retaliation claim. *See James v. City of Montgomery*, 823 F. App'x 728, 735 (11th Cir. 2020) ("Assuming, *arguendo*, but not deciding, that retaliation claims can survive summary judgment under a convincing-mosaic theory, [the plaintiff's evidence] did not create a convincing mosaic of circumstantial evidence that created a triable issue about the [defendant's] retaliatory intent."); *but see Calvert v. Doe*, 648 F. App'x 925, 929 (11th Cir. 2016) (applying the "convincing mosaic" standard to a Title VII retaliation claim). Regardless, there is no convincing mosaic of circumstantial evidence of retaliation in this case.

same requirements of proof and use the same analytical framework" as Title VII retaliation claims. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Therefore, because Berry's retaliation claim fails under Title VII, the claim based on the same facts also fails under Section 1981.

### E. Negligence

Berry claims Defendants are liable for negligence under Alabama law because they allegedly failed in their duties to maintain a workplace free of discrimination and retaliation, to train personnel to fully and fairly investigate all allegations and equally apply corrective measures, and to investigate her complaints. (Doc. 1 at ¶¶ 92-97). She also frames her claim as one for the tort of negligent hiring, retention, training, and supervision. (Doc. 30 at 41). Her negligence claim fails because a plaintiff cannot, as Berry attempts to do, support an Alabama law tort claim with only the same conduct supporting her Title VII and § 1981 claims. *Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1248 (N.D. Ala. 2019); *McCaulley v. Harvard Drug Grp., LLC*, 992 F. Supp. 2d 1192, 1199 (N.D. Ala. 2014). Thus, the Court will enter summary judgment for Defendants on the negligence claim.

### F. Outrage

Finally, Berry claims Defendants are liable for the tort of outrage under Alabama law by utilizing six to eight security guards and two armed police officers during her termination. (Doc. 1 at ¶ 99). She alleges the security and police presence

drew unnecessary attention to her, damaged her professional reputation, and caused her embarrassment, humiliation, and trauma. *Id.* at ¶¶ 100-01.

The tort of outrage "is an extremely limited cause of action" for the recovery of damages for severe emotional distress. *Wilson v. Univ. of Alabama Health Servs. Found., P.C.*, 266 So. 3d 674, 677 (Ala. 2017). To state a claim for outrage under Alabama law, a plaintiff must show that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.* at 676. For conduct to be "extreme and outrageous," causing emotional distress "so severe that no reasonable person could be expected to endure it," it must be "so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.* Here, no reasonable jury could find the security and police presence during Berry's termination met this exceedingly high bar for extreme and outrageous conduct. Therefore, the Court will enter summary judgment for Defendants on the outrage claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 23) is **GRANTED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**. A separate order will be entered contemporaneously with this memorandum opinion.

**DONE** and **ORDERED** December 10, 2021.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE